1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION

Case No. 4:22-md-03047-YGR

MDL No. 3047

This Document Relates to:

MIAMI-DADE COUNTY PUBLIC SCHOOLS DISTRICT, Plaintiff,

vs.

META PLATFORMS, INC., et al., Defendants.

Member Case No.:

4:23-cv-05257

**LOCAL GOVERNMENT AND SCHOOL DISTRICT MASTER SHORT-FORM COMPLAINT AND DEMAND FOR JURY TRIAL**

The Plaintiff(s) named below file(s) this *Short-Form Complaint and Demand for Jury Trial* against the Defendant(s) named below by and through their undersigned counsel. Plaintiff(s) incorporate(s) by reference the allegations, claims, and relief sought in *Plaintiffs' Master Local Government and School District Complaint* ("Master Complaint") as it relates to the named Defendant(s) (checked-off below)*,* filed in *In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, MDL No. 3047, in the United States District Court for the Northern District of California. Plaintiff(s) file(s) this *Short-Form Complaint* as permitted by Case Management Order No 8.

Plaintiff(s) indicate(s) by checking the relevant boxes below the Parties and Causes of Actions specific to Plaintiff(s)' case.

Plaintiff(s), by and through their undersigned counsel, allege(s) as follows:

I.    **DESIGNATED FORUM**

1.  *For Direct Filed Cases:* Identify the Federal District Court in which the Plaintiff(s) would have filed in the absence of direct filing:

United States District Court for the Southern District of Florida.

2.  *For Transferred Cases:* Identify the Federal District Court in which the Plaintiff(s) originally filed and the date of filing:

II.    **IDENTIFICATION OF PARTIES**

A.    **PLAINTIFF(S)**

3.  *Plaintiff(s):* Name(s) of the local government or school district alleging claims against Defendant(s):

Miami-Dade County Public Schools District.

4.  Number of schools served in the Plaintiff(s)' school district or local community:

There are approximately 522 schools in Miami-Dade County.

5.  Number of minors served in the Plaintiff(s)' school district or local community:

There are approximately 328,589 students ages 5-17 in Miami-Dade County.

6.  At the time of the filing of this *Short-Form Complaint*, Plaintiff(s) is/are a resident and citizen of [*Indicate State*]:

The State of Florida.

**B.**     **DEFENDANT(S)**

7.   Plaintiff(s) name(s) the following Defendant(s) in this action [*Check all that apply*]:

| **META ENTITIES** | **TIKTOK ENTITIES** |
|---|---|

☑  META PLATFORMS, INC.,

    *formerly known as* Facebook, Inc.

☑  INSTAGRAM, LLC

☑  FACEBOOK PAYMENTS, INC.

☑  SICULUS, INC.

☑  FACEBOOK OPERATIONS, LLC

☑  FACEBOOK HOLDINGS, LLC

☑  META PAYMENTS INC.

**TIKTOK ENTITIES**

☑  BYTEDANCE LTD

☑  BYTEDANCE INC.

☑  TIKTOK LTD

☑  TIKTOK LLC

☑  TIKTOK INC.

**SNAP ENTITY**

☑  SNAP, INC.

**GOOGLE ENTITIES**

☑  GOOGLE, LLC

☑  YOUTUBE, LLC

**OTHER DEFENDANTS**

For each "Other Defendant" Plaintiff(s) contends are additional parties and are liable or responsible for Plaintiff(s)' damages alleged herein, Plaintiff(s) must identify by name each Defendant and its citizenship, and Plaintiff(s) must plead the specific facts supporting any claim against each "Other Defendant" in a manner complying with the requirements of the Federal Rules of Civil Procedure. In doing so, Plaintiff(s) may attach additional pages to this *Short-Form Complaint*.

| NAME | CITIZENSHIP |
|---|---|
| Alphabet Inc. | Delaware, California |
| XXVI Holdings Inc. | Delaware, California |
| Facebook Technologies, LLC | Delaware, California |
| Discord Inc. | Delaware, California |
| Mark Zuckerberg | Hawaii, California |

### III.    CAUSES OF ACTION ASSERTED

8.   The following Causes of Action asserted in the *Master Complaint*, and the allegations with regard thereto, are adopted in this *Short-Form Complaint* by reference (*check all that are adopted*):

| Asserted Against[1] | Count Number | Cause of Action (COA) |
|---|---|---|
| ☑ Meta entities<br>☑ Snap<br>☑ TikTok entities<br>☑ Google entities<br>☑ Other Defendant(s)[2] | 1 | NEGLIGENCE |
| ☑ Meta entities<br>☑ Snap<br>☑ TikTok entities<br>☑ Google entities<br>☑ Other Defendant(s) | 2 | PUBLIC NUISANCE |

### NOTE

If Plaintiff(s) want(s) to allege additional Cause(s) of Action other than those selected in paragraph 8, which are the Causes(s) of Action set forth in the *Master Complaint*, the facts supporting those additional Cause(s) of Action, must be pled in a manner complying with the requirements of the Federal Rules of Civil Procedure. In doing so, Plaintiff(s) may attach additional pages to this *Short-Form Complaint*.

### IV.    ADDITIONAL CAUSES OF ACTION

9.   Plaintiff(s)  assert(s)  the  following  additional  Causes  of  Action  and  supporting allegations against the following Defendants:

Violation of Florida's Deceptive and Unfair Trade Practices Act, §501.201, et seq. (Against All Defendants); Gross Negligence (Against All Defendants); and Fraudulent Misrepresentation and Concealment (Against All Defendants).

See Attachment A: SUPPORTING ALLEGATIONS REGARDING SHORT-FORM COMPLAINT AND DEMAND FOR JURY TRIAL.

---

[1] For purposes of this paragraph, "entity" means those Defendants identified in Paragraph 7 (*e.g.*, "TikTok entities" means all TikTok Defendants against which Plaintiff(s) is/are asserting claims).

[2] Reference selected "Other Defendants" by the corresponding row number in the "Other Defendant(s)" chart identified in Paragraph 7.

**WHEREFORE**, Plaintiff(s) pray(s) for relief and judgment against Defendants and all such further relief that this Court deems equitable and just as set forth in the *Master Complaint*, and any additional relief to which Plaintiff(s) may be entitled.

## JURY DEMAND

Plaintiff(s) hereby demand a trial by jury as to all claims in this action.

**\*\*\*\***

By signature below, Plaintiff(s)' counsel hereby confirms their submission to the authority and jurisdiction of the United States District Court of the Northern District of California and oversight of counsel's duties under Federal Rule of Civil Procedure 11, including enforcement as necessary through sanctions and/or revocation of *pro hac vice* status.

/s/ Aelish M. Baig

Name: AELISH M. BAIG

Firm: ROBBINS GELLER RUDMAN & DOWD LLP

Address: One Montgomery St., Suite 1800, San Francisco, CA 94104

Phone: 415/288-4545

Fax: 415/288-4534

Email: aelishb@rgrdlaw.com

*Attorneys for Plaintiff(s)*

ATTACHMENT A

1   ROBBINS GELLER RUDMAN
       & DOWD LLP
2   AELISH M. BAIG (201279)
    TAEVA C. SHEFLER (291637)
3   One Montgomery Street, Suite 1800
    San Francisco, CA 94104
4   Telephone: 415/288-4545
    415/288-4534 (fax)
5   aelishb@rgrdlaw.com
    tshefler@rgrdlaw.com
6
    Attorneys for Plaintiff
7
    [Additional counsel appear on signature page.]
8
                    UNITED STATES DISTRICT COURT
9
                   NORTHERN DISTRICT OF CALIFORNIA
10

11   In re SOCIAL MEDIA ADOLESCENT    )   MDL Case No. 4:22-md-03047-YGR
     ADDICTION PERSONAL INJURY        )
     PRODUCTS LIABILITY LITIGATION    )   Case No. 4:23-cv-05257
12                                    )
     ─────────────────────────────── )   SUPPORTING ALLEGATIONS
13                                    )   REGARDING SHORT-FORM COMPLAINT
     This Document Relates To:        )   AND DEMAND FOR JURY TRIAL
14                                    )
     MIAMI-DADE COUNTY PUBLIC         )
     SCHOOLS DISTRICT,                )
15                                    )
                          Plaintiff,  )
16                                    )
           vs.                        )
17                                    )
     META PLATFORMS, INC., et al.,    )
18                                    )
                          Defendants. )
19   ─────────────────────────────── )

20

21

22

23

24

25

26

27

28

4860-7307-8186.v1

## I. ADDITIONAL ALLEGATIONS

1. Plaintiff incorporates by reference each and every allegation in the original Complaint in *Miami-Dade County Public Schools District v. Meta Platforms, Inc.*, No. 4:23-cv-05257-YGR (ECF 1).

### A. Additional Defendants

2. Defendant Alphabet Inc. ("Alphabet") is a Delaware corporation with its principal place of business in Mountain View, California. Alphabet is the sole stockholder of XXVI Holdings Inc.

3. Defendant XXVI Holdings Inc. is a Delaware corporation with its principal place of business in Mountain View, California. XXVI Holdings Inc. is a wholly-owned subsidiary of Alphabet and the managing member of Google LLC.

4. Defendant Meta Platforms, Inc.'s ("Meta" or "Company") subsidiary, defendant Facebook Technologies, LLC ("Facebook Technologies"), was organized under the laws of the State of Delaware as "Oculus VR, LLC" on March 21, 2014 and acquired by Meta on March 25, 2014. Facebook Technologies develops Meta's virtual and augmented reality technology, such as the Meta Quest line of services, among other technologies related to Meta's platforms, and its principal place of business is in Menlo Park, California. Defendant Meta is the sole member of Facebook Technologies.

5. Defendant Mark Elliot Zuckerberg ("Zuckerberg") is the Chief Executive Officer ("CEO"), board chair, and controlling shareholder of Meta. He is a resident of both California and Hawaii.

6. Defendant Discord Inc. ("Discord") is a Delaware corporation. Its principal place of business is in San Francisco, California. Its primary product, a social media platform called Discord, was launched in 2015 and is widely available throughout the United States.

### B. Additional Allegations Regarding Defendant Mark Zuckerberg

7. Plaintiff incorporates by reference each and every allegation against Zuckerberg and Meta included in Plaintiffs' Second Amended Master Complaint (Personal Injury), No. 4:22-cv-0304-YGR (N.D. Cal.) (ECF 494) and the Attorneys' General Complaint for Injunctive

and Other Relief against Meta in *People of the State of California v. Meta Platforms, Inc.*, No. 4:23-cv-05448-YGR (N.D. Cal.) (ECF 73-2) ("AGs' Complaint").

8.      Zuckerberg is Meta's CEO, board chair, and controlling shareholder, and he is also the founder of Facebook.  In his role at Meta, Zuckerberg exercised outsized control over important policy decisions related to youth safety at the Company's social media platforms – Facebook, Inc. ("Facebook"), Instagram LLC ("Instagram"), and Messenger (collectively, "Social Media Platforms").  Zuckerberg maintained control of Facebook by instituting a non-traditional governance model and has called it a "founder-led company."[1]  Zuckerberg has likewise claimed credit for Instagram's success since its acquisition.  Zuckerberg told market analysts that Instagram "wouldn't be what it is without everything that we put into it, whether that's the infrastructure or our advertising model. . . ."[2]

9.      Zuckerberg has long been aware that Facebook and Instagram are harmful to children, in part because they are designed to foster compulsive use, provoke unhealthy social comparisons, and have age verification systems that are easily bypassed.  Beginning as early as 2014, Zuckerberg has been presented with countless studies – from external advocates and Meta's own researchers – that his Social Media Platforms lead to negative mental and physical outcomes for kids.

10.      Zuckerberg has consistently steered his Social Media Platforms away from policies designed to reduce harm to its young users, such as vetoing a ban on cosmetic surgery filters and declining to invest in efforts to prevent problematic use like moderating content surrounding self-harm and suicide.  Zuckerberg made these choices knowing that his Social Media Platforms harm children, even after other Meta employees urged him to take action to protect children using these platforms.  Zuckerberg has made false claims that these platforms are safe to use by children even

---

[1]    Mike Isaac & Leslie Picker, *Facebook Plans New Stock Class to Solidify Mark Zuckerberg's Control*, N.Y. Times (Apr. 27, 2016), https://www.nytimes.com/2016/04/28/technology/facebook-q1-earnings.html?action=click&module=RelatedCoverage&pgtype=Article&region=Footer.

[2]    Salvador Rodriguez, *Mark Zuckerberg is adamant that Instagram should not be broken off from Facebook*, CNBC (Oct. 30, 2019), https://www.cnbc.com/2019/10/30/mark-zuckerberg-is-adamant-that-instagram-should-remain-with-facebook.html.

1    though he is aware that the academic consensus and Meta's own research indicate that social media

2    has a profoundly negative impact on youth.

3         11.      Zuckerberg has knowingly directed the design of Facebook and Instagram to foster

4    compulsive use and addiction. The amount of time users engage with the Social Media Platforms is

5    a central metric Zuckerberg and the Company use to measure success. Nonetheless, Zuckerberg

6    publicly denied that he directed the Social Media Platforms be designed to induce young users to

7    spend ever-increasing amounts of time on the platforms.

8         12.      In a December 2015 email, Zuckerberg listed one of Meta's goals for 2016 as seeing

9    the "[t]ime spent [on the Social Media Platforms] increas[] by 12%" over the following three years.

10    Zuckerberg wrote that he hoped to see time spent on Instagram increase by 10% between 2016 and

11    2021.[3]

12         13.      In February 2016, Zuckerberg sent an email to his executive team on "opportunities

13    for teens and sharing."[4] Zuckerberg's email discussed how successful different platform features are

14    at getting the attention of teenagers and keeping them engaged.

15         14.      Sean Parker, founding president of Meta, explicitly acknowledged that Meta and

16    Zuckerberg sought to addict users from Facebook's very founding:

> The thought process that went into building these applications, Facebook being the first of them . . . was all about: "[h]ow do we consume as much of your time and conscious attention as possible?" That means that we need to sort of give you a little dopamine hit every once in a while, because someone liked or commented on a photo or a post or whatever. And that's going to get you to contribute more content and that's going to get you . . . more likes and comments. It's a social-validation feedback loop . . . exactly the kind of thing that a hacker like myself would come up with, because you're exploiting a vulnerability in human psychology. The inventors, creators – me, Mark [Zuckerberg], Kevin Systrom on Instagram, all of these people – understood this consciously. And we did it anyway.

---

3    *See* AGs' Complaint §§57, 143. In an earnings call in 2016, Zuckerberg disclosed that users spend an average 50 minutes per day on the Facebook, Instagram, and Messenger platforms. James B. Stewart, *Facebook Has 50 Minutes of Your Time Each Day. It Wants More*, N.Y. Times (May 5, 2016), https://www.nytimes.com/2016/05/06/business/facebook-bends-the-rules-of-audience-engagement-to-its-advantage.html.

4    Thomas Barrabi, *Meta exec Adam Mosseri wanted to 'upsell' Instagram to children under 13: lawsuit*, N.Y. Post (Feb. 5, 2024), https://nypost.com/2024/02/05/business/meta-exec-adam-mosseri-wanted-to-upsell-instagram-to-children-under-13-lawsuit/.

15.     Meta's algorithms also use artificial intelligence ("AI") to keep users engaged. Information in a user's feed is not listed chronologically, but rather is provided via Meta's algorithms, which are AI systems that Meta uses "to decide what content appears, informed by the choices [users] make."  These algorithms purportedly seek to "predict how valuable a piece of content might be to" a user, based upon the user's online activity, including whether the user "share[d]" content, "like[d]" content, or otherwise engaged with content.[5]  They often result in harmful experiences for children.

16.     Zuckerberg overrode concerns among Meta executives that the Company should ease off heavy use of push notifications, on which Meta relied to boost engagement, especially among teen users.[6]  The notifications were internally thought to aggravate what the Company called "problematic use."  However, one executive ended the debate when she noted that daily usage "is a bigger concern for Mark right now than user experience."[7]

17.     Despite understanding the harms that prolonged use of social media has on children, Zuckerberg made no attempts to make his products safe to use and, in fact, measured success based on continued engagement.

18.     Zuckerberg is aware that Social Media Platforms are harmful to children but continues to be less than transparent about that in public discussions and Congressional hearings.

19.     Zuckerberg has long been aware that Meta's Social Media Platforms are harmful especially for young users.  In 2014, over 100 public-health advocates signed on to a letter[8] to

---

[5]   Nick Clegg, *How AI Influences What You See on Facebook and Instagram* (June 29, 2023), https://about.fb.com/news/2023/06/how-ai-ranks-content-on-facebook-and-instagram/.

[6]   Jeff Horwitz, *Meta Designed Products to Capitalize on Teen Vulnerabilities, States Allege*, Wall St. J. (Nov. 25, 2023), https://www.wsj.com/business/media/meta-designed-products-to-capitalize-on-teen-vulnerabilities-states-allege-6791dad5.

[7]   *Id.*

[8]   Campaign for a Commercial-Free Childhood, Letter to Mark Zuckerberg Re: Facebook Messenger Kids (Jan. 30, 2018), https://fairplayforkids.org/wp-content/uploads/archive/devel-generate/gaw/FBMessengerKids.pdf

1  Zuckerberg documenting that increased use of Facebook among 10- to 12-year-old girls was linked
2  with body image concerns, the idealization of thinness, and increased dieting.[9]

3      20.    In 2016, Zuckerberg attended a conference where a mother explained that "her
4  daughter feels worse about herself after using Instagram." After the event, a Meta researcher sent an
5  email to Zuckerberg stating: "thought you'd be interested in some of the relevant research our team's
6  done on social comparison," showing that "4% of feed stories trigger negative social comparison,"
7  and "39% of Facebook users have felt negative social comparison in the past month."

8      21.    Likewise, in April 2019, Meta's own researchers directly told Zuckerberg that passive
9  consumption of social media content, including scrolling, browsing, and watching videos, is
10  associated with negative effects on well-being.[10] The email to Zuckerberg noted that the three
11  negative drivers that occur frequently on Facebook include problematic use, social comparison, and
12  loneliness.[11]

13      22.    In 2019 and 2020, Zuckerberg met with psychologist and leading expert Jonathan
14  Haidt ("Haidt"), a New York University professor studying the effects of social media on teens'
15  mental health. Haidt addressed his research "on the dramatic rise in rates of teenage anxiety,
16  depression, and self-harm" and explained how the research on social media's role "points heavily to
17  a connection, not just from correlational studies but from true experiments, which strongly indicate
18  causation, not just correlation."[12]

19

20

21

22

---

[9]    Marika Tiggemann & Amy Slater, *NetTweens: The Internet and body image concerns in preteenage girls*, 34(5), J. Early Adolesc. 606-620 (June 2014), https://journals.sagepub.com/doi/epub/10.1177/0272431613501083.

[10]    Email from Nick Clegg to Mark Zuckerberg, Re: Well-being product strategy and tech headcount, Aug. 28, 2021, https://www.blumenthal.senate.gov/imo/media/doc/13124meta documents.pdf.

[11]    *Id.*

[12]    META3047MDL-003-00089174 at -176.

23.    In 2021, a former Facebook employee and Meta consultant sent Zuckerberg and other executives an email warning that Instagram was not doing enough to protect children from harassment and other harms.[13]  Zuckerberg never replied.

24.    Zuckerberg consistently ignored pleas from employees to protect children.

25.    Despite being educated on the harms his Social Media Platforms have on children, time and again Zuckerberg dismissed concerns from his own employees that Meta needed to take steps to safeguard minors from the negative impacts of social media.

26.    Zuckerberg ignored pleas to ban cosmetic filters.

27.    Zuckerberg vetoed extending a short-term ban on so-called cosmetic surgery filters that allow users to remove blemishes and otherwise alter their appearance.  Zuckerberg was sent a memo detailing information provided to Meta from "21 independent experts around the world," finding: "[t]hese extreme cosmetic surgery effects can have severe impacts on both the individuals using the effects and those viewing the images."  The experts warned Meta: "[c]hildren are particularly vulnerable" to these impacts, in addition to "those with a history of mental health challenges [and] eating disorders[.]"

28.    The memo Zuckerberg received also included a review of academic research on the negative impact edited images have on viewers' satisfaction with their own bodies.  The researchers agreed "that these effects are cause for concern for mental health and wellbeing" but noted that banning the filters may have a "negative growth impact" on the Company.  A follow-up report sent to Zuckerberg highlighted the disproportionate impact that filters have on children and teen girls.

29.    A meeting with Zuckerberg and other Meta employees to decide whether Meta should permanently ban cosmetic filters was abruptly canceled.  Instead, ***Zuckerberg vetoed*** extending the ban.  Zuckerberg wrote that there was "clear[] demand" for the filters and dismissed any concerns as "paternalistic."  Ignoring the plethora of research that his employees provided to him, Zuckerberg falsely claimed that he had seen "no data" suggesting that the filters were harmful.   After

---

[13]    Written Testimony of Arturo Bejar before the Subcommittee on Privacy, Technology, and the Law, Nov. 7, 2023, https://www.judiciary.senate.gov/imo/media/doc/2023-11-07_-_testimony_-_bejar.pdf.

1  Zuckerberg's final decision on the matter, Meta employee Gould Stewart wrote to Zuckerberg: "I

2  respect your call on this and I'll support it, but want to just say for the record that I don't think it's

3  the right call given the risks . . . .  I just hope that years from now we will look back and feel good

4  about the decision we made here."[14]

5         30.    Zuckerberg ignored pleas to invest in users' well-being.

6         31.    In April 2019, Zuckerberg again ignored an employee imploring him to invest in user

7  well-being on Instagram and Facebook.  David Ginsberg ("Ginsberg"), then Meta's Vice President

8  of Research, emailed Zuckerberg to recommend that Meta invest in users' well-being because "there

9  is increasing scientific evidence (particularly in the US . . .) that the average net effect of [Facebook]

10  on people's well-being is slightly negative."[15]  Ginsberg explained that Meta has a "deep

11  understanding around three negative drivers that occur frequently on [Facebook] and impact

12  people's well-being: [p]roblematic use . . . , [s]ocial comparison . . . , [and] [l]oneliness."[16]  Without

13  investment, Ginsberg warned, initiatives to combat these negative effects would not be fully staffed.

14  Meta's leadership declined to take action.

15         32.    Similarly, former Vice President of Global Affairs Nick Clegg ("Clegg") told

16  Zuckerberg: "[O]ur present policies and public stance on teenage self harm and suicide are so

17  difficult to explain publicly that our current response looks convoluted and evasive."

18         33.    In August 2021, Clegg renewed his plea  to Zuckerberg for increased investment in

19  wellbeing.  Clegg warned Zuckerberg: "We are not on track to succeed for our core well-being

20  topics (problematic use, bullying & harassment, connections, and SSI),* and are at increased

21  regulatory risk and external criticism.  These affect everyone, especially Youth and Creators; if not

22  addressed, these will follow us into the Metaverse. . . ."[17]  Clegg also noted that politicians

23

24  [14]  Cristiano Lima-Strong & Naomi Nix, *Zuckerberg 'ignored' executives on kids' safety,*
    *unredacted lawsuit alleges*, Wash. Post (Nov. 8, 2023), https://www.washingtonpost.com/

25  technology/2023/11/08/zuckerberg-meta-lawsuit-kids-safety/.

26  [15]  Nick Clegg, *supra* n.10.

27  [16]  *Id.*  "SSI" refers to "suicide and self-injury."  META3047MDL-003-00068863.

28  [17]  Nick Clegg, *supra* n.10.

worldwide raised "concerns about the impact of our products on young people's mental health."[18] He added that a survey of U.S. policy elites revealed "concerns about the potential impacts of AR/VR on young users, particularly with regard to time spent on the devices and the potential for harmful actors to target children."[19]   Clegg concluded that while Meta had a "strong program of research," it "need[s] to do more and [is] being held back by a lack of investment on the product side which means that [it is] not able to make changes and innovations at the pace required to be responsive to policymaker concerns."[20]

34.   In a subsequent email, another executive conceded that there was a "very low-likelihood that Mark [Zuckerberg] chooses to fund more here."  Indeed, Zuckerberg ignored Clegg's request for months.[21]

35.   In August 2021, Senators Richard Blumenthal and Marsha Blackburn wrote to Zuckerberg, raising their concern about the harmful impact of social media on the mental health of children and teenagers.  The senators asked Zuckerberg whether Meta's own research had "ever found that its platforms and products can have a negative effect on children's and teens' mental health or well-being."[22]   In its response, Meta concealed that its own research concluded that the answer was a resounding "yes."[23]

36.   Just as Zuckerberg ignored Clegg, Zuckerberg never responded to an October 5, 2021 email from Arturo Bejar ("Bejar"), Former Facebook Director of Engineering for Protect and Care, urging the Company to take action.  In his email, Bejar informed Zuckerberg and other executives

---

[18]   *Id.*

[19]   *Id.*

[20]   *Id.*

[21]   *Id.*

[22]   Richard Blumenthal & Marsha Blackburn, U.S. Senate Letter to Mark Zuckerberg (Aug. 4, 2021),   https://www.blackburn.senate.gov/services/files/874B5612-CE63-46FC-967E-A05ED0433780.

[23]   Georgia Wells, Jeff Horwitz, *et al.*, *Facebook Knows Instagram Is Toxic for Teen Girls, Company Documents Show*, Wall St. J. (Sept. 14, 2021), https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739?mod=hp_lead_pos7.

that 13% of Instagram users aged 13-15 self-reported having received unwanted sexual advances via the platform within the previous seven days.  Despite this staggering level of harassment, Zuckerberg failed to make changes.  In 2023, Bejar testified to Congress about his experience: "All this time there has been extensive harm happening to teenagers, and the leadership has been aware of it, but they have chosen not to investigate or address the problems." [24]

37.     Zuckerberg's strategy for Meta includes recruiting young users, even though he knows the Social Media Platforms expose children to danger.

38.     Attracting young users is a part and parcel of Meta's business strategy, and Meta is aware that millions of its users are under 13 years of age.  While technically Instagram does not allow users under 13 years of age, Meta and Zuckerberg know that users frequently lie about their age when they sign up for Instagram.  Meta's lax age verification is no surprise given that Zuckerberg has said he believes younger children should be allowed on social networking sites.[25]

39.     In January 2018, Zuckerberg received an internal report revealing that Meta had 4 million users under the age of 13 – roughly 30% of all 10- to 12-year-olds in the United States.  Meta is aware that its age verification process allows 11- and 12- year-olds to easily bypass Meta's Social Media Platforms.

40.     Zuckerberg misled Congress when he testified on March 25, 2021: "[I]f we detect that someone might be under the age of 13, even if they lied, we kick them off."  In reality, when an account is reported as belonging to a user under 13 years of age, both Facebook and Instagram require verification before deleting their account.[26]  Requiring verification to suspend a user's account, but not at time of the account's activation, ensures that millions of young children have access to the Social Media Platforms.  Moreover, Meta fails to meet its obligation under the

---

[24]   Arturo Bejar, *supra* n.13.

[25]   Kashmir Hill, *Mark Zuckerberg Is Wrong About Kids Under 13 Not Being Allowed on Facebook*, Forbes (May 20, 2011), https://www.forbes.com/sites/kashmirhill/2011/05/20/mark-zuckerberg-is-wrong-about-kids-under-13-not-being-allowed-on-facebook/?sh=1058b5b15506 (Zuckerberg told Fortune Tech: "My philosophy is that for education you need to start at a really, really young age.").

[26]   Instagram, *Report an Underage User on Instagram*, https://help.instagram.com/contact/723586364339719?fbclid=IwAR3E5rZo8zvp9Uw3giRoQRMy5qFmIGpy-NOLLtpctHOwkalXtfJ1ft9O09Q (last visited Mar. 13, 2024).

1    Children's Online Privacy Protection Act of 1998 to provide "verifiable parental consent" for minors

2    to use Facebook or Instagram.  Its purported ban on under-13-year-old users is a smokescreen for

3    Meta's true goal of capturing users as young as possible.

4         41.    Moreover, Meta and Zuckerberg have allowed Facebook and Instagram to become a

5    marketplace for predators in search of these very children.  Tests conducted by *The Wall Street*

6    *Journal* and the Canadian Centre for Child Protection revealed that Meta's recommendation systems

7    promote pedophile accounts.[27]

8         42.    A subsequent Meta task force revealed that Instagram's algorithms "connected a web

9    of accounts devoted to the creation, purchasing, and trading of underage-sex content." *Id.*  Instagram

10   was not only hosting such activities, but its recommendation systems were "connecting pedophiles

11   with [one] another and guiding them to content sellers." *Id.*  Although Meta lets users flag problem

12   content, "its system often ignores or dismisses reports of child exploitation." *Id.*  In one example, a

13   predator in New Mexico recruited more than 100 minor victims through Facebook.[28]

14        43.    In California, a predator used Facebook to arrange sex trafficking of a 15-year-old

15   from Arizona.[29]  In Bucks County, Pennsylvania, a mother told a news outlet that her 16-year-old

16   daughter was blackmailed and harassed with nude pictures of her exchanged and posted on

17   Instagram.  Some partial blurring of her daughter's body allowed the user to bypass Instagram's

18   algorithms that ban nudity.[30]  In two Florida cases involving sexual exploitation of minors, the

19   underage victims were lured through Meta's Social Media Platforms.[31]

20

21   [27]  Jeff Horwitz & Katherine Blunt, *Meta Is Struggling to Boot Pedophiles Off Facebook and
22   Instagram*, Wall St. J. (Dec. 1, 2023), https://www.wsj.com/tech/meta-facebook-instagram-
     pedophiles-enforcement-struggles-dceb3548.

23   [28]  Kate Gibson, *Facebook and Instagram are steering child predators to kids, New Mexico AG
24   alleges*, CBS News (Dec. 6, 2023), https://www.cbsnews.com/news/facebook-instagram-meta-mark-
     zuckerberg-children-pedophiles-new-mexico-lawsuit/.

25   [29]  Press Release, U.S. Attorney's Office, District of Arizona, *California Man Sentenced to 8 Years
26   in Prison for Conspiracy to Commit Sex Trafficking of a Minor* (Feb. 13, 2019),
     https://www.justice.gov/usao-az/pr/california-man-sentenced-8-years-prison-conspiracy-commit-
     sex-trafficking-minor.

27   [30]  Samantha Murphy Kelly, *Why Bucks County, Pennsylvania is suing social media companies*,
28   Phila. Tribune (Apr. 2, 2023), https://www.phillytrib.com/news/business/why-bucks-county-
     pennsylvania-is-suing-social-media-companies/article_5bafe921-76f2-590b-9856-6745f8a1cfb2.

44. Child abuse on the Social Media Platforms is commonplace: Meta's internal documents show 100,000 children are sexually harassed every day on its Social Media Platforms.[32] Meta has further given cover to would-be predators by implementing end-to-end encryption for messages.[33] As a result, Meta will no longer have access to the contents of the messages that users send or receive unless one participant reports a message to the Company.

45. Zuckerberg made false and misleading statements to the public.

46. Knowing full well that Meta's Social Media Platforms have a negative impact on the well-being of young users, Zuckerberg has time and again claimed that the Social Media Platforms are safe for children, contradicting Meta's own research demonstrating otherwise.

47. In January 2018, Zuckerberg said Meta is "focused on making sure Facebook isn't just fun to use, but also good for people's wellbeing."[34] In truth, Zuckerberg was focused on increasing user engagement at the expense of Meta's users' well-being. *See supra*.

48. At a March 25, 2021 Congressional hearing, Zuckerberg repeated his claims that Meta's Social Media Platforms do not harm children.[35] Instead, Zuckerberg suggested that social media is good for teens and adults alike because they "help people stay connected to people they

---

html#:~:text=But%20on%20Friday%2C%20their%20hometown%20of%20Bucks%20County,are%20designed%20to%20%E2%80%9Cexploit%20for%20profit%E2%80%9D%20their%20vulnerabilities.

[31] *United States v Montijo*, 2022 WL 93535 (M.D. Fla. Jan. 10, 2022); *United States v Pedrosa*, 2022 WL 20056290 (S.D. Fla. Sept. 9, 2022).

[32] Katie McQue, *Meta documents show 100,000 children sexually harassed daily on its platforms*, Guardian (Jan. 18, 2024), https://www.theguardian.com/technology/2024/jan/18/instagram-facebook-child-sexual-harassment.

[33] Jeff Horwitz & Katherine Blunt, *Meta Starts Fully Encrypting Messages on Facebook and Messenger App*, Wall St. J. (Dec. 6, 2023), https://www.wsj.com/tech/meta-to-start-fully-encrypting-messages-on-facebook-and-instagram-a936c4f9.

[34] Dominic Rushe, *Facebook posts $4.3bn profit as Zuckerberg laments 'hard year,'* Guardian (Jan. 31, 2018), https://www.theguardian.com/technology/2018/jan/31/facebook-profit-mark-zuckerberg.

[35] Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation, Hearing Before House Energy and Commerce Subcommittee on Communications and Technology (Mar. 25, 2021), https://www.congress.gov/117/chrg/CHRG-117hhrg46925/CHRG-117hhrg46925.pdf.

1    care about, which I think is one of the most fundamental and important human things that we do."

2    *Id.*

3    49.    Zuckerberg also denied that Facebook's newsfeed and video reels are designed to

4    foster prolonged use or that Meta's goal is to increase the time users spend on this platform.

5    Zuckerberg testified that Meta does not "make money off of creating an addiction to [its] platforms."

6    *Id.* He added: "the way we design our algorithms is to encourage meaningful social interactions"

7    and denied that Meta's teams "have goals[] of trying to increase the amount of time that people

8    spend [using Meta's Social Media Platforms]."[36] Yet, as of March 8, 2024, the head of Facebook

9    has been touting the efficacy of Facebook's new AI model capable of keeping users passively

10   consuming video content for 8%-10% longer. It is no secret that time spent on the Social Media

11   Platforms supports Meta's bottom line.

12   50.    Zuckerberg also denied that passive consumption of social media content, such as the

13   Social Media Platforms' endless feed and video reels, harmed children's mental health. Zuckerberg

14   instead pointed out that "social apps to connect with other people can have positive mental health

15   benefits and well-being benefits by helping people feel more connected and less lonely." *Id.*

16   Zuckerberg made this statement knowing that Meta's internal research showed that social media has

17   a net-negative impact on youth wellbeing.

18   51.    Again, on October 5, 2021, Zuckerberg publicly stated in a post on his Facebook

19   profile: "At the heart of these accusations is this idea that we prioritise [sic] profit over safety and

20   well-being. That's just not true."[37]

21   52.    As outlined above, Zuckerberg knew that his statements, both to the public and

22   Congress, were patently false.

23

24

25

26   [36]   *Id. cf. supra* §I.A.

27   [37]   Dan Milmo, *Mark Zuckerberg hits back at Facebook whistleblower claims*, Guardian (Oct. 6,
     2021),    https://www.theguardian.com/technology/2021/oct/06/mark-zuckerberg-hits-back-at-
28   facebook-whistleblower-frances-haugen-claims.

C.     **Additional Allegations Relating to Defendant Discord**

53.     Plaintiff incorporates by reference each and every allegation against Discord included in *C.U. v. Snap Inc.*, No. 4:22-cv-07347-YGR (N.D. Cal.) (ECF 1), and *Guillot v. Meta Platforms, Inc.*, No. 4:23-cv-03453-YGR (N.D. Cal.) (ECF 1).

54.     Discord is an instant messaging and social media platform that allows for users to communicate with each other through private and group-based messaging, including through text, photos, videos, and video calls.  It can be likened to a series of chat rooms and groups in which users can engage in conversation with others.  It was launched in 2015.  As of January 2024, the platform had more than 196 million active users each month.[38]  As noted by co-founder and CEO Jason Citron at the January 31, 2024 Congressional hearing, more than 60% of Discord's active users are between the ages of 13 and 24 years old.[39]

55.     Discord generates revenue through user subscription fees that gives users access to features like custom emojis for $5 or $10 per month.  Discord also generates revenue through access to their server, of which the company takes a 10% cut.[40]

56.     Discord has designed, developed, produced, operated, promoted, distributed, and marketed its platforms to attract, capture, and addict youth, with minimal parental oversight.  Not only are Discord's features engineered to induce compulsive use by young people, it has also failed to reasonably protect child users and help limit and prevent child sexual exploitation, sextortion, and distribution of known Child Sexual Assault Material ("CSAM") by failing to implement certain design features that prioritize children's safety.

57.     Discord has designed and operates its product in such a way that it also allows people to chat using fake names; and the task of enforcing community standards is largely delegated to the

---

[38]   Werner Geyser, *The Latest Discord Statistics: Servers, Revenue, Data, and More*, Influencer Marketing Hub (Jan. 30, 2024), https://influencermarketinghub.com/discord-stats/.

[39]   Adi Robertson, *Meta, TikTok, and other tech companies go to Contress: all the news*, Verge (Jan. 31, 2024), https://www.theverge.com/2024/1/31/24056136/congress-child-safety-hearing-kosa-meta-x-discord-snap-tiktok/archives/2.

[40]   Kellen Browning, *How Discord, Born From an Obscure Game, Became a Social Hub for Young People*, N.Y. Times (Dec. 29, 2021), https://www.nytimes.com/2021/12/29/business/discord-server-social-media.html.

organizers of individual Discord groups, called "servers."[41]  By default, all users – including users under 18 years old – can receive friend invitations from anyone in the same server, which opens the ability for them to send and receive private messages from strangers.[42]

58.    Discord's dangerous and harmful design features include, *inter alia*, a lack of reliable age verification to determine users' ages; failure to implement effective parental controls; failure to implement effective parental notifications; failure to enable default protections for youth in order to protect against compulsive use or overuse of the product; and a lack of community safety precautions to prevent adults from preying on children, such as false assurances that certain features will keep users safe and downplaying the dangers of its product to youth users.

59.    Discord's terms of use prohibit users under 13 years old, but Discord does not verify user age or identity.  There is no parental notification to parents when a youth user signs up for a new account.  Because it has failed to implement a robust and effective age verification process, there are children aged 13 and under using the product; in fact, Discord is aware that children as young as eight years old are currently using the product.[43]  Discord has access to information within its platform to identify the age of its users because youth users often state their real age in their bio and/or tell other users their real age in group and private chats using one or more Discord product features.  Youth users also post photos that often reflect their actual age.

60.    In many cases, youth users are able to access Discord throughout the school day because it is not one of the applications that is blocked on school networks, such as Snapchat and Instagram.[44]

61.    Discord has failed to implement safety features such that there is an unreasonable opportunity for and risk of sexual exploitation of youth on the platform.  By default, all product users – including users under 18 years old – can receive friend invitations from anyone in the same server,

---

[41]   *Id.*

[42]   Samantha Murphy Kelly, *The dark side of Discord for teens*, CNN Bus. (Mar. 22, 2022), https://www.cnn.com/2022/03/22/tech/discord-teens/index.html.

[43]   Kellen Browning, *supra* n.40.

[44]   Samantha Murphy Kelly, *supra* n.42.

1  which opens the ability for them to send and receive private messages from strangers.[45]  Discord has

2  failed to implement effective parental controls to prevent such activity from causing harm to youth.

3  Discord has failed to implement effective tools for youth/parent users to choose to avoid such

4  problematic and harmful experiences.

5      62.    Discord's purported "safety" features create a false sense of security on the platform,

6  which create an unreasonable risk of harm to youth.  For instance, until in or around October 2023,

7  the Discord support pages described the platform's "Safe Direct Messaging" options in the following

8  ways:

9  - <u>Keep me safe</u>: the safest option.  This will have Discord scan any image sent in all
   DMs, regardless of whether you've added the user on your friend list, or the user is
10   DMing you just by sharing a mutual server.

11 - <u>My friends are nice</u>: The medium-est option!  This will let Discord know to scan any
   images sent in DMs from users that aren't on your friends list, but also to trust your
12   previously-added friends and not worry about any images they send.

13
14 - <u>Do not scan</u>: The self-confident option.  Enabling this option will completely disable
   Discord's image scanning process, and leave you for a walk on the wild side for any
   and all DMs you receive.  Careful, it's a jungle out there!
15

16     63.    These representations reasonably would lead youth users to believe that Discord will

17  scan for and block sexually explicit materials, including materials used to groom and/or blackmail

18  youth users.  Discord should not be offering less-safe options ("My friends are nice" and "Do not

19  scan") to youth users without parental consent.  The less-safe options as product features are further

20  defective and/or dangerous for youth users because they downplay the risks of sexually explicit

21  and/or otherwise harmful content through direct messaging, with descriptions such as "the wild side"

22  and "a jungle," and suggesting that the "Do not scan" option is "The self-confident option."  This

23  creates a false sense of security that results in direct harm to Discord's youth users.

24     64.    Further, the safe messaging features do not operate as promised.  The "Keep me safe"

25  option, as described, would reasonably lead a youth user to understand that Discord's scanning

26  service would keep them "safe" from predatory users and sexually explicit and/or otherwise harmful

27

28 _____
[45]  *Id.*

SUPPORTING ALLEGATIONS REGARDING SHORT-FORM COMPLAINT AND DEMAND FOR
JURY TRIAL – 4:23-cv-5257-YGR                                                    - 15 -
4860-7307-8186.v1

content.  However, Discord's safety scanning service did not do even that.  This option filters explicit context received in direct messages only, not those received through group messaging.[46] The viewing and trading of CSAM is rampant via Discord.[47]

65.    Discord's complete lack of parental controls also presents an unreasonable risk of harm to youth users.  This allows youth to use the platform and be exposed to the risks of trauma, abuse, grooming, and exploitation through use of the product, all under the false impression that Discord is taking affirmative action to keep the users safe.

66.    Youth users on Discord are exposed to sexual predators, who contact them over the platform, cultivate emotional connections, and engage in "grooming" in order to exploit, manipulate, and abuse such youth users.[48]  Youth are exposed to self-harm chats, including shared tips on how to hide cutting and other self-harm from parents, and suggested advice on how to run away from home (in at least one reported instance to meet up with an adult met through the platform).[49]

67.    Discord does not provide effective warnings to youth users or parents regarding the unreasonable risk of harm to youth in using the product.  It makes it difficult for parents or other visitors of the platform to report CSAM, other inappropriate or harmful content, or predatory user accounts without needing to either log into the platform or have significant information only obtainable from the platform.

---

[46]   Letter from Patrick Trueman and Dawn Hawkins, End Sexual Exploitation, to Jason Citron, CEO of Discord, April 26 2023, https://endsexualexploitation.org/wp-content/uploads/Discord-Notification-Letter_DDL-2023_FINAL_Redacted.pdf.

[47]   *Id.*; Parents Together, Afraid, Uncertain, and Overwhelmed: A Survey of Parents on Online Sexual Exploitation of Children (2023), https://parentstogetheraction.org/wp-content/uploads/2023/03/PTPDF final-2.pdf.

[48]   *See* Dee Dee Gatton, *Discord app raises safety concerns as experts warn of sexual exploitation risks*, 24 News (June 22, 2023), https://nbc24.com/news/nation-world/discord-app-raises-safety-concerns-as-experts-warn-of-sexual-exploitation-risks-the-national-center-on-sexual-exploitation-purdue-university-dr-kathryn-seigfried-spellar-chat-app-grooming-social-media-platform; Samantha Murphy Kelly, *supra* n.42.

[49]   Samantha Murphy Kelly, *supra* n.42.

68.    Discord has additional product defects that encourage compulsive use and overuse of its product.  For instance, Discord does not provide an option to users to self-restrict time on the platform.

69.    Youth lack the cognitive ability and life experience to identify online grooming behavior by adults and the psychosocial maturity to decline invitations to exchange sexually explicit or otherwise salacious or violent material and mass-messaging capabilities.  At all relevant times, Discord allowed direct messaging with and by youth without parental notification.

70.    In 2023, Discord finally began to implement additional safety features for youth.  In July 2023, Discord launched a Family Center that allows for limited parental monitoring of youth users' activities on Discord.[50]  This program is "opt-in," which means youth must choose to include their parents in the Family Center in order for it to be effective.  In October 2023, Discord launched the "Teen Safety Assist" initiative to attempt to address some of the risks to youth users.[51]  Two of the new features include a safety alert to a teen user when a teen user receives a direct message from a user for the first time and a content filter that automatically blurs sensitive content received through a direct or group message.[52]

71.    Discord's defective and harmful product features present unreasonable risks of harm to youth users and have directly harmed youth users.  Because Discord allows fake usernames, does not verify age, does not facilitate parental controls, and misleads users to believe that there is a "safe" messaging option, youth have been groomed, exploited, and abused by other users through Discord without protection, as well as exposed to harmful content, such as self-harm and violent material.[53]  Discord enables sexual predators to text, call, and video chat with youth users and prey on their vulnerabilities.

---

[50]    *Stay Connected with Your Teen Using Discord's Family Center*, Discord Blog (July 11, 2023), https://discord.com/blog/discord-family-center-stay-connected-with-your-teen.

[51]    *How We're Making Discord the Best Place to Hang Out and Have Fun with Your Friends*, Discord Blog (Oct. 19, 2023), https://discord.com/blog/best-place-to-hang-out-with-friends.

[52]    *Id.*

[53]    Samantha Murphy Kelly, *supra* n.42; Kellen Browning, *supra* n.40.

SUPPORTING ALLEGATIONS REGARDING SHORT-FORM COMPLAINT AND DEMAND FOR
JURY TRIAL – 4:23-cv-5257-YGR                                                                    - 17 -
4860-7307-8186.v1

72.     Without the appropriate safety features for youth, youth users have found their way to chat rooms that share information about self-harm or eating disorders, have been subjected to sexual exploitation and manipulation by sexual predators, and have had exploitative content shared via Discord's servers.[54]  A June 2023 report found that since Discord's launch, at least 35 criminal prosecutions involving charges of kidnapping, grooming, or sexual assault and 165 prosecutions related to child sexual abuse included communications using Discord.[55]

73.     Discord's own transparency reports reveal that it received over 416,000 reports related to child safety from October 2023 to December 2023 alone.[56]  It also received over 895,000 reports for exploitative and unsolicited content.[57]

74.     Discord's design features and conduct facilitating the abuse of youth and exacerbating the spread of CSAM have caused Plaintiff to divert and increase resources and expenditures to provide education, counseling, disciplinary, and other social services to harmed youth.

### D.      Defendants Employ Artificial Intelligence in Ways that Expose Youth to Harmful Experiences

75.     Defendants utilize AI and machine learning through the development and operation of features, including the release of original content, that are inherently dangerous and harmful to youth.  These features serve to facilitate compulsive use, overuse, and addiction by youth users, as well as expose youth to harmful experiences due to the lack of meaningful protections for youth users.

76.     Defendants' use of AI and machine learning falls into at least three categories: the use of AI to promote addictive use; AI machine learning to conduct content moderation; and the

---

[54]    Samantha Murphy Kelly, *supra* n.42.

[55]    Ben Goggin, Child predators are using Discord, a popular app among teens, for sextortion and abductions, NBC News (June 21, 2023), https://www.nbcnews.com/tech/social-media/discord-child-safety-social-platform-challenges-rcna89769.

[56]    Discord, *Transparency Reports*  (Jan. 16,  2024),  https://discord.com/safety-transparency-reports/2023-q4.

[57]    *Id.*

1    development and publication of AI-generated original content, including, but not limited to, through

2    large language models such as chatbots.

3        77.    Defendants, including Google, YouTube, Meta, Facebook, Snap, Discord, and

4    TikTok, intentionally design and operate their platforms to maximize users' screen time through the

5    use of features intended to exploit human psychology using complex algorithms driven by advanced

6    AI and machine-learning systems.  For example, YouTube has developed and operates machine

7    learning technology with the goal of increasing the amount of time users spend watching content on

8    YouTube.  The AI-driven suggestions succeed in maximizing user engagement.  YouTube Chief

9    Product Officer Neal Mohan stated in 2018 that YouTube's AI-driven recommendations are

10   responsible for 70% of the time users spend on YouTube.[58]  In other words, 70% of all YouTube

11   content that users watch was recommended to users by YouTube's machine learning technology, as

12   opposed to users purposely searching for and identifying the content they watch.  Defendants have

13   failed to implement effective parental controls to prevent such activity from causing harm to youth.

14   Defendants have failed to implement effective tools for youth/parent users to choose to avoid such

15   problematic and harmful experiences.

16       78.    Meta also uses AI to keep users engaged.   Rather than display information

17   chronologically, posts are displayed based on a user's previous online activity, including whether the

18   user previously "share[d]," "like[d]," or otherwise engaged with similar content.[59]  In March 2024,

19   Meta unveiled that it will begin using a new artificial model across all its Social Media Platforms

20   that promises to be even more effective at prolonging the time that users spend online.[60]  Tom

21   Alison, head of Facebook, said that the new model kept users watching its video "Reels" for 8%-

22   10% longer, proving that the model was "learning from the data much more efficiently than the

23   previous generation."  Defendants have failed to implement effective parental controls to prevent

24

25   [58]   Joan E. Solsman, *YouTube's AI is the puppet master over most of what you watch*, CNET (Jan. 20, 2018), https://www.cnet.com/tech/services-and-software/youtube-ces-2018-neal-mohan/.

26   [59]   Nick Clegg, *supra* n.5.

27   [60]   Jonathan Vanian, *Meta is building a giant AI model to power its 'entire video ecosystem,' exec says*, CNBC (Mar. 6, 2024), https://www.cnbc.com/2024/03/06/facebook-working-on-single-ai-
28   model-to-power-all-video-recommendations.html.

1  such activity from causing harm to youth.  Defendants have failed to implement effective tools for

2  youth/parent users to choose to avoid such problematic and harmful experiences.

3      79.    Second, Defendants rely on AI-driven technology to moderate content on their

4  platforms, which fail to detect and block inappropriate and harmful content accessed by youth.  This

5  leads to harms, including, but not limited to, youth users getting exposed to CSAM; getting targeted

6  by adult predators; and finding content that promotes self-harm, such as how to engage in cutting

7  and hide it from adults.  Defendants have failed to implement effective parental controls to prevent

8  such activity from causing harm to youth.  Defendants have failed to implement effective tools for

9  youth/parent users to choose to avoid such problematic and harmful experiences.

10     80.    Third, Defendants have developed and are operating chatbots that engage with users,

11  including youth users, with original content composed by the applications themselves.  For instance,

12  Meta recently unveiled an AI chatbot with 28 personas, among them the "ride-or-die older sister"

13  resembling Kendall Jenner, aimed at engaging younger users.[61]  In 2023, Snap added to its feed "My

14  AI," an AI chatbot that engages with users, including children, with on-demand text produced by the

15  application itself.  Snapchat developed this "virtual friend" to further increase engagement.  It has

16  features that make its chatbot more "friendly," such as the option to customize the chatbot's name,

17  design a custom bitmoji avatar for it, and include it in group chats with friends.[62]  It is not possible to

18  remove the chatbot from a user's feed unless that user pays to subscribe to Snap's premium

19  subscription service.

20     81.    In tests that have been recreated multiple times, Snap's My AI responds to self-

21  identified youth users with inappropriate and misleading content, including how to hide the smells of

22  alcohol and marijuana, "setting the mood" for a minor having sex with a 30-year-old for the first

23

24

25  ---

[61]  Wes Davis, *Meta's AI chatbot plan includes a 'sassy robot' for younger users*, Verge (Sept. 24,
26  2023), https://www.theverge.com/2023/9/24/23887773/meta-ai-chatbots-gen-ai-personas-young.

27  [62]  Samantha Murphy Kelly, *Snapchat's new AI chatbot is already raising alarms among teens and
parents*, CNN Bus. (Apr. 27, 2023), https://www.cnn.com/2023/04/27/tech/snapchat-my-ai-
28  concerns-wellness/index.html.

1  time, and writing essays for self-identified students when asked to do so for a school project.[63]  It

2  even explains to teens how to hide the Snap application from parental monitoring.[64]  In user tests, the

3  My AI becomes more problematic the longer one chats with it.[65]

4         82.    Snap's My AI is also problematic in providing mental health advice to youth users

5  because it can reinforce confirmation bias, allowing users to continue to feel badly if they approach

6  the chatbot in a negative mood.[66]  According to Alexandra Hamlet, a clinical psychologist in New

7  York City: "If a teen is in a negative mood and does not have the awareness desire to feel better, they

8  may seek out a conversation with a chatbot that they know will make them feel worse. . . .  Over

9  time, having interactions like these can erode a teens' sense of worth, despite their knowing that they

10 are really talking to a bot."[67]

11        83.    Defendants' large language models, such as Snap's My AI, put youth users at an

12 unreasonable risk of harm and expose youth users to harmful experiences and inappropriate and

13 dangerous content created by Defendants themselves.  Defendants are aware that their AI language

14 models are "experimental" and yet continue to expose youth to harm through the original content

15 they produce.[68]  Defendants have failed to implement effective parental controls to prevent such

16 activity from causing harm to youth.  Defendants have failed to implement effective tools for

17 youth/parent users to choose to avoid such problematic and harmful experiences.

18

19 ───────────────
   [63]  Geoffrey A. Fowler, *Snapchat tried to make a safe AI.  It chats with me about booze and sex*,
20 Wash. Post (Mar. 14, 2023), https://www.washingtonpost.com/technology/2023/03/14/snapchat-
   myai/;  *see also*  Common  Sense  Media,  AI  Initiative,  *My AI*  (Oct. 19,  2023),
21 https://www.commonsensemedia.org/ai-ratings/my-ai.

22 [64]  *Id.*

23 [65]  *Id.*

24 [66]  Sarah Perez, *Several popular AI products flagged as unsafe for Kids by Common Sense Media*,
   Tech  Crunch  (Nov. 16,  2023),  https://techcrunch.com/2023/11/16/several-popular-ai-products-
25 flagged-as-unsafe-for-kids-by-common-sense-media/#:~:text=An%20independent%20review%20
   of%20popular%20AI%20tools%20has,Stable%20Diffusion%2C%20may%20not%20be%20safe
26 %20for%20kids.

27 [67]  Samantha Murphy Kelly, *supra* n.62.

28 [68]  Geoffrey A. Fowler, *supra* n.63.

**II.    ADDITIONAL CAUSES OF ACTION**

**COUNT III**

**Violation of Florida's Deceptive and Unfair
Trade Practices Act, §501.201, *et seq.*
(Against All Defendants)**

84.    Plaintiff incorporates by reference each and every allegation in the original Complaint in *Miami-Dade County Public Schools District v. Meta Platforms, Inc.*, No. 4:23-cv-05257-YGR (ECF 1).

85.    Plaintiff brings this claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") as to all Defendants.

86.    FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Fla. Stat. Ann. §501.204(1).  In construing the provisions of FDUTPA, "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to §5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. §45(a)(1) as of July 1, 2017."[69]

87.    Plaintiff's claim rests on Defendants' affirmative conduct, which has resulted in the current public health crisis impacting youth mental health.

88.    Plaintiff is an "[i]nterested party or person" within the meaning of Fla. Stat. §501.203(6) and a "person" as envisioned in Fla. Stat. Ann. §501.211.

89.    Defendants engage in "[t]rade or commerce" as defined by FDUTPA.  *See* Fla. Stat. Ann. §501.203(8).

90.    A deceptive act occurs when there is a "representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003).

91.    An unfair practice is "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'"

---

[69]    Fla. Stat. Ann. §501.204(2).

92.    Defendants engaged in unfair and deceptive accts and practices that violated FDUTPA by:

(a)    designing, marketing, promoting, and/or operating their platforms in a manner intended to prioritize harmful content and maximize the time youth spend on their respective platforms, despite knowledge of the harms to youth from their wrongful conduct;

(b)    manipulating users to keep using or coming back to their platforms through the use of IVRs;

(c)    intentionally marketing their platforms to children and teens, directly facilitating the widespread, excessive, and habitual use of their platforms among youth; and

(d)    knowingly designing and modifying their platforms in ways that promote excessive and problematic use in ways known to be harmful to children.

93.    By seeking to capitalize on their success by refining their platforms to prioritize harmful content and manipulate youth to spend excessive time on their platforms, Defendants have engaged in deceptive practices that were likely to and did mislead youth acting reasonably in the circumstances, to their detriment.

94.    Defendants' immoral, unethical, oppressive, and unscrupulous practices described above resulted in substantial injuries to youth and the current public health crisis affecting youth mental health.

95.    As a direct and proximate result of Defendants' FDUTPA violations, Plaintiff has suffered harm and is threatened with continuing harm.

96.    Plaintiff has incurred damages and has had to take steps to mitigate the harm and disruption caused by Defendants' conduct, including the following:

(a)    creating a new Office of Mental Health and Student Services to address students' mental, emotional, and social health;

(b)    hiring additional personnel, including counselors, social workers, psychologists, and mental health coordinators, to address students' mental, emotional, and social health;

1    (c)    increasing training for teachers and staff to identify students exhibiting

2  symptoms of depression, anxiety, and suicide;

3    (d)    creating a parent assistance line to help caregivers address their children's

4  mental health needs;

5    (e)    hiring additional personnel to respond to and manage efforts to combat harm

6  caused by Defendants' platforms, including cyberbullying, violence, and vandalism;

7    (f)    creating and maintaining an online system for students, parents, and others to

8  anonymously report bullying;

9    (g)    training teachers and staff on bullying intervention strategies;

10    (h)    developing awareness and informational campaigns to educate students about

11  the dangers of using Defendants' platforms;

12    (i)    developing trainings, lesson plans, toolkits, flyers, videos, and other materials

13  to teach students, teachers, staff, parents, and other members of the community about the dangers of

14  using Defendants' platforms;

15    (j)    repairing property damage as a result of students acting out because of mental,

16  social, and emotional problems caused by Defendants' conduct;

17    (k)    increasing time spent addressing bullying, harassment, and threats;

18    (l)    diverting time and resources from instructional activities to notify parents and

19  guardians of students' behavioral issues;

20    (m)    investigating and responding to threats made against Plaintiff's public schools

21  and students over social media;

22    (n)    updating student handbooks to address use of Defendants' platforms; and

23    (o)    updating District and school webpages to address use of and harm resulting

24  from Defendants' platforms.

25    97.    FDUTPA's safe-harbor provision §501.212(2) does not apply to Defendants.  First,

26  Plaintiff is not alleging Defendants are liable for what others have said on Defendants' platforms but

27  rather for Defendants' own conduct.  Second, Plaintiff's claims arise from Defendants' status as

28  designers and marketers of dangerous social media platforms that have injured the health, comfort,

1  and repose of its community.  The nature of Defendants' platforms centers around Defendants' use

2  of algorithms and other design features that maximize harmful content and encourage users to spend

3  the maximum amount of time on their platforms – not on particular third-party content.  Third,

4  Defendants are liable for the content they create.  Fourth, Defendants knowingly violated FDUTPA

5  by intentionally designing and operating platforms targeted at youth that amplify harmful content

6  and addictive utilization.  Fifth, Plaintiff does not seek to hold Defendants liable as publishers or

7  speakers of information provided by other content providers; instead, Plaintiff seeks to hold

8  Defendants liable for distributing material they know or should know is harmful or unlawful.

9        98.    The above-described conduct has been willful within the meaning of Fla. Stat. Ann.

10 §501.2075 and is unlawful under FDUTPA.

11                                    **COUNT IV**

12                               **Gross Negligence**
                             **(Against All Defendants)**

13       99.    Plaintiff incorporates by reference each and every allegation in the original Complaint

14 in *Miami-Dade County Public Schools District v. Meta Platforms, Inc.*, No. 4:23-cv-05257-YGR

15 (ECF 1).

16       100.   Defendants owed the public legal duties, including a preexisting duty not to expose

17 Plaintiff's public schools to an unreasonable risk of harm and a duty to exercise reasonable and

18 ordinary care and skill in accordance with the applicable standards of conduct in design, marketing,

19 promoting, and operating their platforms.

20       101.   At all relevant times to this litigation, Defendants had a duty to exercise reasonable

21 care in the designing, marketing, promoting, and operating of their platforms, including the duty to

22 take all reasonable steps necessary to design, market, promote, and operate their platforms in a way

23 that was not unreasonably dangerous to youth.

24       102.   At all times relevant to this litigation, Defendants knew or should have known of the

25 dangers of Defendants' platforms and, specifically, that their prioritization and creation of harmful

26 content and facilitation of widespread, excessive, and habitual use of their platforms by youth

27

28

1  resulted in, and continues to result in, significant harm to Plaintiff.  As such, Defendants have

2  breached their duty of care owed to Plaintiff.

3      103.    Defendants have breached and continue to breach their duty of care owed to Plaintiff

4  through their actions, business decisions, and policies in the development, setup, management,

5  maintenance, operation, marketing, advertising, promotion, supervision, and control of their

6  respective platforms.

7      104.    Defendants' conduct was so reckless or wanting in care that it constitutes a conscious

8  disregard or indifference to the life, safety, or rights of persons exposed to such conduct, including

9  youth in Plaintiff's schools, in that they acted with reckless indifference to the results, or to the rights

10  or safety of others, because Defendants knew, or a reasonable person or company in Defendants'

11  position should have known, that Defendants' conduct created an unreasonable risk of harm, and the

12  risk was so great that it was highly probable eharm would result.  Defendants' gross negligence

13  caused Plaintiff to suffer harm.

14      105.    The gross negligence of Defendants includes, but is not limited to, the following:

15          (a)    designing, marketing, promoting, and/or operating their platforms in a manner

16  intended to prioritize and create harmful content and maximize the time youth spend on their

17  respective platforms, despite knowledge of the harms to youth from their wrongful conduct;

18          (b)    manipulating users to keep using or coming back to their platforms  through

19  the use of IVRs;

20          (c)    intentionally marketing their platforms to youths and adolescents, directly

21  facilitating the widespread, excessive, and habitual use of their platforms among youth; and

22          (d)    knowingly designing and modifying their platforms in ways that promote

23  excessive and problematic use in ways known to be harmful to children.

24      106.    Defendants knew and/or should have known it was foreseeable that Plaintiff would

25  suffer injuries as a result of Defendants' failure to exercise ordinary care in the designing, marketing,

26  promoting, and/or operating of their platforms, particularly when Defendants targeted youth in

27  Plaintiff's schools.

28

107.    As a direct and proximate cause of Defendants' grossly negligent conduct, Plaintiff has suffered and will continue to suffer harm.

108.    Defendants' willful, knowing, and reckless conduct therefore warrants an award of aggravated or punitive damages.

## COUNT V

**Fraudulent Misrepresentation and Concealment**
**(Against All Defendants)**

109.    Plaintiff incorporates by reference each and every allegation in the original Complaint in *Miami-Dade County Public Schools District v. Meta Platforms, Inc.*, No. 4:23-cv-05257-YGR (ECF 1).

110.    At all times relevant to this litigation, each Defendant concealed and intentionally failed to disclose material facts known to it regarding the dangers of its social media platforms for youth.  Defendants sought to further the public perception about the safety of their social media platforms for youth by disseminating false statements to Congress and to the public.  Any risk disclosures were substantially understated.

111.    Each Defendant intended the omission of the concealed facts to deceive Plaintiff.

112.    Plaintiff was unaware of the concealed facts.  Plaintiff, its agents, and the public justifiably relied on the false information Defendants provided to them, both directly and indirectly, as Defendants intended.  As a result, Plaintiff proceeded under the misapprehension that the youth mental health crisis was a result of conduct by persons other than Defendants and was prevented from taking more effective and earlier steps to respond to the youth mental health crisis.

113.    Had Plaintiff known the truth about the concealed facts, Plaintiff would have taken other steps to correct the false information and address earlier the youth mental health crisis it faced.

114.    Each Defendant's failure to disclose information about the true level of danger presented by Defendants' social media platforms to Plaintiff's students deceived Plaintiff and was a substantial factor in causing harm to Plaintiff.

115.    Plaintiff was damaged due to its justified reliance on each of the Defendants' fraudulent misrepresentations and concealments, which were made with oppression, fraud, or malice.

DATED:  March 14, 2024

ROBBINS GELLER RUDMAN
  & DOWD LLP
AELISH M. BAIG
TAEVA C. SHEFLER
SNEHEE KHANDESHI


                              s/ Aelish M. Baig
                           AELISH M. BAIG

One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
aelishb@rgrdlaw.com
tshefler@rgrdlaw.com
skhandeshi@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
STUART DAVIDSON (admitted *pro hac vice*)
NICOLLE B. BRITO (CA Bar No. 333130)
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
sdavidson@rgrdlaw.com
nbrito@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
ANA S. AVALOS CUELLAR
420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  212/432-5100
acuellar@rgrdlaw.com

HALICZER PETTIS & SCHWAMM, P.A.
EUGENE PETTIS
Seventh Floor, One Financial Plaza
100 SE 3rd Avenue
Fort Lauderdale, FL  33394
Telephone:  407/841-9866
407/841-9915 (fax)
epettis@hpslegal.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KOPELOWITZ OSTROW FERGUSON
  WEISELBERG GILBERT
SCOTT WEISELBERG
1 West Las Olas Blvd., 5th Floor
Fort Lauderdale, FL  33301
Telephone:  954/525-2100
954/525-4300 (fax)
weiselberg@kolawyers.com

Attorneys for Plaintiff